**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ASHLEY DESVARIEUX, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> AXIOM HOLDINGS, INC. and CURTIS RILEY, <br><br> Defendants. | No. 1:17-CV-04756 (JPC) |

**MEMORANDUM OF LAW IN SUPPORT OF CLASS REPRESENTATIVES'
MOTION TO ENTER DEFAULT JUDGMENT AGAINST
DEFENDANT AXIOM HOLDINGS, INC.**

# TABLE OF CONTENTS

Page(s)

I.     LEGAL STANDARD ................................................................................................. 1

II.    CASE SUMMARY ..................................................................................................... 2

    A.    Party Identification ......................................................................................... 2

    B.    Procedural History ......................................................................................... 3

    C.    Nature of the Claims against Axiom ............................................................. 4

III.   PROPOSED FINDINGS OF FACT ........................................................................ 5

IV.   ARGUMENT ........................................................................................................... 11

    A.    The Entry of Default against Axiom, Together with Axiom's Admissions, Establish Its Liability for Violations of Section 10(b) of the Exchange Act ........ 11

        1.    The Proffered Exhibits are Admissible as Evidence against Axiom ........ 11

        2.    The Evidence Establishes Axiom's Liability under Section 10(b) of the Exchange Act ....................................................................................... 13

    B.    The Court Should Enter a Default Judgment for the Plaintiffs and the Class and against Axiom ................................................................................................. 17

        1.    Plaintiffs and the Class are Substantially Prejudiced by Axiom's Delay . 18

        2.    The Grounds for Default Judgment are Clearly Established ................... 18

        3.    Axiom's Default is Willful ................................................................. 18

        4.    Axiom Has No Meritorious Defenses to Plaintiffs' Claims ................... 19

        5.    The Other Factors Do Not Support Denial of Relief .............................. 19

    C.    The Court May Appropriately Enter Default Judgment on the Issue of Damages as to Axiom before Disposing of the Claims as to Riley ......................................... 20

    D.    An Inquest into Damages is Unnecessary ......................................................... 21

    E.    The Class is Entitled to an Award of $1,420,000 in Damages, and to Recover Interest, Reasonable Attorneys' Fees & Costs ................................................... 23

        1.    Statutory Damages ................................................................................. 23

        2.    Interest .................................................................................................. 24

    F.    Class Counsel Reserve Their Right To Move For Attorney's Fees and Costs ..... 25

V.    CONCLUSION ....................................................................................................... 25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ...................................................................................................22

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) ............................................................................................................16

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
   955 F.3d 254 (2d Cir. 2016) ...............................................................................................13

*Au Bon Pain Corp. v. Artect, Inc.*,
   653 F.2d 61 (2d Cir. 1981) ..................................................................................................19

*Boguslavsky v. Kaplan*,
   159 F.3d 715 (2d Cir. 1998) ..........................................................................................20, 21

*Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v.
   Moulton Masonry & Constr., LLC*,
   779 F.3d 182 (2d Cir. 2015) ...................................................................................... *passim*

*Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found.
   Contractors, Inc.*,
   699 F.3d 230 (2d Cir. 2012) ..................................................................................................2

*Chen v. Jenna Lane, Inc.*,
   30 F. Supp. 2d 622 (S.D.N.Y. 1998) ...................................................................................11

*Chowdhury v. WorldTel Bangl. Holding, Ltd.*,
   746 F.3d 42 (2d Cir. 2014) ..................................................................................................11

*Cotton v. Slone*,
   4 F.3d 176 (2d Cir. 1993) ....................................................................................................11

*In re Crazy Eddie Sec. Litig.*,
   948 F. Supp. 1154 (E.D.N.Y. 1996) ....................................................................................22

*Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*,
   722 F.2d 1319 (7th Cir. 1983) .............................................................................................21

*Dura Pharm. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................................................23

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 428 (S.D.N.Y. 2013) .................................................................................12

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015)...........................................................................24, 25

*Flaks v. Koegel*,
    504 F.2d 702 (2d Cir. 1974)...........................................................................................21

*Francis v. City of New York*,
    2019 WL 8918743 (S.D.N.Y. Nov. 12, 2019).................................................................23

*Francis v. City of New York*,
    No. 15 Civ. 7997 (VSB) (SLC), 2020 WL 2792995 (S.D.N.Y. May 29, 2020) ....................23

*Gierlinger v. Gleason*,
    160 F.3d 858 (2d Cir. 1998)...........................................................................................24

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)............................................................................15

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019)............................................................................15

*HICA Educ. Loan Corp. v. Bolte*,
    2012 WL 423361 (S.D.N.Y. Feb. 10, 2012)..............................................................18, 19

*Hirsch v. Innovation Int'l, Inc.*,
    1992 WL 316143 (S.D.N.Y. Oct. 19, 1992)....................................................................20

*House of Diamonds, Inc. v. Borgioni LLC*,
    2009 WL 2633144 (S.D.N.Y. Aug. 26, 2009).................................................................18

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020)........................................................................................14, 15

*Kleartex (U.S.A.), Inc. v. Kleartex SDN BHD*,
    1994 WL 733688 (S.D.N.Y. June 9, 1994) .....................................................................22

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991)...........................................................................................12

*Lemus v. Manhattan Car Wash, Inc.*,
    2010 WL 4968182 (S.D.N.Y. Nov. 24, 2010).........................................................17, 19, 20

*Libertad v. Welch*,
    53 F.3d 428 (1st Cir. 1995).............................................................................................12

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)...........................................................................................15

*In re Nortel Networks Corp. Sec. Litig.*,
   539 F.3d 129 (2d Cir. 2008)..................................................................25

*Priestly v. Headminder, Inc.*,
   647 F.3d 497 (2d Cir. 2011).....................................................................1

*In re Puda Coal Sec. Inc. et al. Sec. Litig.*,
   2017 WL 65325 (S.D.N.Y. Jan. 6, 2017) ...............................................23

*In re Puda Coal Sec. Inc.*,
   No. 11 Civ. 2598 (DLC) (HBP), 2017 WL 511834 (S.D.N.Y. Feb. 8, 2017) ........................23

*In re Rockwell Med., Inc. Sec. Litig.*,
   2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) .........................................15

*Rosenberg v. Curry Chevrolet Sales & Serv., Inc.*,
   152 F.3d 920, 1998 WL 406307 (2d Cir. 1998) .....................................12

*Schruefer v. Winthorpe Grant, Inc.*,
   2003 WL 21511157 (S.D.N.Y. July 2, 2003) .........................................11

*Sec. & Exch. Comm'n v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996).....................................................11, 13, 24

*Sec. & Exch. Comm'n v. Tavella*,
   77 F. Supp. 3d 353 (S.D.N.Y. 2015)......................................................21

*Sette-Hughes v. Sprauve*,
   663 F. App'x 10 (2d Cir. 2016) ..............................................................23

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008)................................................................................13

*In re SunEdison, Inc. Sec. Litig.*,
   300 F. Supp. 3d 444 (S.D.N.Y. 2018).............................................20, 21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)................................................................................15

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*,
   109 F.3d 105 (2d Cir. 1997).....................................................................2

*Trs. of Local 7 Title Indus Welfare Fund v. Caesar Max Tile Corp.*,
   2014 WL 991723 (E.D.N.Y. Mar. 13, 2014).........................................20

*In re UBS Auction Rate Sec. Litig.*,
   2010 WL 2541166 (S.D.N.Y. June 10, 2010) .......................................12

*United States v. McKeon*,
   738 F.2d 26 (2d Cir. 1984) ........................................................................12

*In re Vivendi Universal, S.A. Sec. Litig.*,
   284 F.R.D. 144 (S.D.N.Y. 2012) ..........................................................24, 25

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ................................................................16, 17

**Statutes**

15 U.S.C. § 78 ...........................................................................................1, 14, 22

28 U.S.C. § 1961 ..................................................................................................25

Private Securities Litigation Reform Act of 1995 ..........................17, 22, 24

Securities Exchange Act of 1934 ................................................... *passim*

**Rules**

Fed. R. Civ. P. 23 ...............................................................................................25

Fed. R. Civ. P. 55 ................................................................................. *passim*

Fed. R. Evid. 201 ...............................................................................................12

Fed. R. Evid. 801 ........................................................................................11, 12

Fed. R. Evid. 803 ........................................................................................12, 13

Local Civil Rule 55.2(b) .....................................................................................1

**Other Authorities**

17 C.F.R. § 240.10b–5 ..................................................................................17, 20

https://www.sec.gov/litigation/suspensions/2017/34-80986.pdf ...................12

Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, Rule 55.2(b)(2) of the Local Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York, and in accordance with this Court's Order dated July 7, 2020, *see* ECF No. 67, Plaintiffs and the Class respectfully apply for the entry of default judgment against Defendant Axiom Holdings, Inc. ("Axiom") upon the Clerk of the Court's certificate of default entered on January 15, 2021. *See* Clerk's Certificate of Default, ECF No. 78. This application is based on the instant memorandum of law; the supporting Declaration of Murielle J. Steven Walsh (the "Walsh Decl."), together with the Exhibits attached thereto and incorporated by reference therein; and on such other matters as may properly come before the Court at the presentation and hearing of this application.

As set forth below, and as supported by the Walsh Declaration, the Class seeks the entry of judgment against Axiom for its violations of Section 10(b) of the Securities Exchange Act of 1934, *codified as amended*, 15 U.S.C. § 78j(b), and an award of monetary damages in the amount of $1,420,000, exclusive of interest, reasonable costs, and attorneys' fees.

## I.   LEGAL STANDARD

Rule 55 establishes a two-step process for the entry of default judgment. *Priestly v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011). The first step requires the movant to "obtain an entry of default" from the Clerk of the Court. *Id.* at 505 (citing Fed. R. Civ. P. 55(a)). The second step requires the movant to "apply to the court for entry of a default judgment," *id.* (citing Fed. R. Civ. P. 55(b)), attaching the Clerk's certificate of default to the application. Local Civil Rule 55.2(b). A "party's default is deemed to constitute a concession of all well pleaded allegations of liability." *Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 189 (2d Cir. 2015) (internal quotation marks and citation omitted).

The issue and measure of damages are committed to the Court's sound discretion. *Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contractors, Inc.*, 699 F.3d 230, 233 (2d Cir. 2012). In deciding damages, the Court may rely on the movants' submissions, "including briefs, audits, and affidavits," *Moulton*, 779 F.3d at 189, and may, but need not, conduct a hearing, so long as there is an evidentiary "basis for the damages specified in the default judgment." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997) (internal quotation marks and citation omitted). By its Order Authorizing Default Judgment Motion dated July 7, 2020, the Court has "determined that an investigation of the factual basis of the allegations of the complaint herein pursuant to Fed. R. Civ. P. 55(b)(2) is appropriate" and has ordered that the instant motion "be accompanied by evidence, in admissible form" and that the motion "will be taken on submission unless otherwise directed by the Court." *See* Walsh Decl., Ex. 38 at 2.

## II.    CASE SUMMARY

### A.    Party Identification

The Plaintiffs are Class Representatives Phillip H. Rhodes, Jr. and Shem Properties, Inc. (collectively, the "Plaintiffs") who bring claims on behalf of themselves and on behalf of a certified Class whose members are "[a]ll those who purchased or otherwise acquired Axiom Holdings, Inc. securities during the period from October 14, 2016 to June 19, 2017 [(the "Class Period")], both dates inclusive," and who were injured by a series of disclosures revealing that their investments in Axiom were worthless. Walsh Decl., Ex. 37 at 3. "Excluded from the Judgment Class is anyone named as a defendant, the officers and directors of Axiom Holdings, Inc., who held such positions at any relevant time, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest." *Id.*

The Defendants are Axiom and Curtis Riley ("Riley").  Axiom is a corporation organized and existing under the laws of the State of Nevada, with its principal executive offices at Room C, 15/F, Ritz Plaza, 122 Austin Road, Tsimshatsui, Kowloon, Hong Kong.  *See* Walsh Decl. Ex. 1.  Riley is a natural person who was, at all relevant times, Axiom's Chief Executive Officer, Chief Financial Officer, and Director.  *See id.*, Ex. 1 ¶ 18; Ex. 22 ¶ 16.  Axiom has not responded to the Complaint.  *Id.*, Ex. 57.  Riley appears *pro se*.  *Id.*, Ex. 21.

### B.     Procedural History

The Complaint in this securities class action was filed on June 22, 2017.  See Walsh Decl., Ex. 1.  On August 21, 2017, a copy of the Complaint, Summons, and civil cover sheet were delivered via first-class mail to the Company's then-designated registered agent in Nevada.  *See* Walsh Decl., Ex. 2.  On September 12, 2017, the Court appointed Brenda and Kerry Johnston, Phillip H. Rhodes, Jr., and Shem Properties, Inc. as Co-Lead Plaintiffs, and Block & Leviton LLP and Pomerantz LLP as Lead Counsel.  *Id.*, Ex. 3.

On December 19, 2017, a copy of the Complaint, Summons, and civil cover sheet were delivered via FedEx to Axiom's Legal Department at its headquarters in Hong Kong.  *See id.*, Ex. 9 at Ex. D.  Plaintiffs made several attempts to serve Riley at various addresses with which he claimed to be associated between December 18, 2017 and January 22, 2018.  *Id.*, Exs. 4–9.

On August 16, 2018, Plaintiffs sought leave from the Court to serve Axiom through its newly designated registered agent in Nevada and to effect alternative service on Riley.  *See id.*, Ex. 6–9.  On September 18, 2018, for good cause shown, the Court granted Plaintiffs leave to serve Axiom at its new Nevada address.  *Id.*, Ex. 10.  On September 28, 2018, Axiom was served with copies of the Complaint, Summons, and civil cover sheet via personal service on its domestic registered agent in Nevada.  *Id.*, Exs. 12–17.  To date, Axiom has not responded to the lawsuit, and on January 15, 2021, the Clerk noted Axiom's default.  *Id.*, Ex. 57.

3

On October 5, 2018, for good cause shown, the Court granted Plaintiffs leave to serve Riley with alternative process.  *Id.*, Ex. 18.  On October 9, 2018, Riley was served with copies of the Complaint, Summons, and civil cover sheet.  *Id.*, Exs. 19–20.  Riley answered the Complaint *pro se* on November 13, 2018.  *Id.*, Ex. 22.

On June 28, 2019, Plaintiffs filed their Motion for Class Certification in Advance of Entry of Default Judgment, with supporting papers.  *Id.*, Exs. 23–26.  On July 15, 2019, the Court ordered Plaintiffs to submit a supplemental memorandum and certain affidavits.  *Id.*, Ex. 27.   Plaintiffs filed their supplemental memorandum and the court-ordered affidavits on July 29, 2019.  *Id.*, Exs. 29–36.  On July 6, 2020, the Court granted Plaintiffs' Motion for Class Certification, *id.*, Ex. 37, and on July 7, 2020, the Court by Order authorized the Class Representatives to file a motion for default judgment.  *Id.*, Ex. 38.  On July 16, 2020, Class Representatives moved by letter motion for an extension of time to file the instant motion for default judgment, *id.*, Ex. 39, and the Court granted the requested extension on July 17, 2020.  *Id.*, Ex. 40.  On January 15, 2021, Class Representatives requested a Clerk's Certificate for the Entry of Default against Axiom, *id.*, Exs. 45–56, and the Clerk issued the Order of Default on the same day.  *Id.*, Ex. 57.

## C.    Nature of the Claims against Axiom

This is a certified securities fraud class action arising out of a botched reverse merger between Axiom and a Chinese power company, CJC Holdings, Ltd. ("CJC").  Walsh Decl., Ex. 1 ¶¶ 20–29, 31–32, 34; Ex. 22 ¶ 2.  The Complaint alleges that Axiom made a series of materially false and misleading statements, upon which Plaintiffs and Class Members relied when purchasing Axiom's securities between October 14, 2016 and June 19, 2017, inclusive (the "Class Period"), in an active and efficient market, and that they were damaged upon the revelation of Axiom's fraud.

### III.    PROPOSED FINDINGS OF FACT

Axiom is a Nevada corporation with its principal executive offices at Room C, 15 F, Ritz Plaza, 122 Austin Road, Tsim Sha Tsui Kowloon, Hong Kong.  Walsh Decl Ex. 58 at 9.  From August 6, 2013 through May 16, 2018, Axiom's registered agent authorized to accept service of process on behalf of the Company was Corporate Direct, Inc., 2248 Meridian Boulevard, Sutie H, Minden, Nevada 89423.  *Id.* at 26.  As of May 17, 2018 and continuing into the present, Axiom's registered agent authorized to accept service of process on behalf of the Company is InCorp Services, Inc., 3773 Howard Hughes Parkway, Suite 500S, Las Vegas, Nevada 89169.  *Id.* at 27. Axiom was duly served with a true and correct copy of the Summons and Complaint through its registered agent on October 4, 2018.  *Id.*, Ex. 17.  Axiom has failed to respond to this lawsuit, and the Clerk of the Court entered default against Axiom on that basis on January 15, 2021.  *Id.*, Ex. 57.

On October 10, 2016, "the Company appointed Curtis Riley as the Company's Chief Executive Officer and Chief Financial Officer to succeed Low Tuan Lee."  Walsh Decl. Ex. 59 at 3.  Also effective October 10, 2016, Riley was "appointed as a member of the Company's board of directors."  *Id.*  As of October 10, 2016, Riley had "over 25 years of experience" in, among other things, "forging strategic partnerships, completing merger and acquisition transactions, and structuring large scale outsourcing arrangements in India, China, South America, and Europe."  *Id.* Riley holds a Bachelor of Science in Electric Engineering from the University of Texas, Austin as of 1983.  *Id.*

> From January 2014 to January 2016, Mr. Riley was a Senior Partner with Silverbear Capital, Inc., a Hong Kong based consulting and investment banking firm. From June 2012 to January 2014, Mr. Riley was an Executive Director, Global Channels with gen-E Technologies, which created and maintained partnerships between itself and systems integrators in Asia, India and North America. From June 2011 to June 2012, Mr. Riley was the Vice President of Business Development at Allsec Technologies, a provider of business process outsourcing services including loan

modifications, default services, telemarketing, customer care, and technical
support. My Riley served as a Director of Jiasen International Holdings from
September 2015 to May 2016.

*Id.*  On October 14, 2016, Axiom filed a Current Report on Form 8-K with the SEC, announcing

the Company's entry into a Share Exchange Agreement with CJC Holdings, Ltd. (the

"Agreement").  *See id.*  Pursuant to the Agreement, Axiom agreed "to acquire all of the issued and

outstanding shares of CJC from the CJC Shareholders in exchange for the issuance to the CJC

Shareholders of 200,000,000 shares of the Company's common stock, par value $0.001 per share."

*Id.* at 2.

On November 9, 2016, Axiom filed a quarterly report on Form 10-Q with the SEC,

announcing the Company's financial and operating results for the quarter ended September 30,

2016.  *See* Walsh Decl. Ex. 60 (the "Q3 2016 10-Q").  In the Q3 2016 10-Q, the Company stated:

Share Exchange Agreement

On October 10, 2016, the Company entered into a Share Exchange Agreement (the
"Agreement") with CJC Holdings, Ltd., a Hong Kong corporation (together with
its subsidiaries, "CJC") and the two shareholders of CJC, Hu Dengyang and Yang
Chuan (the "CJC Shareholders"). CJC, through its subsidiaries, operates and
constructs hydropower electric generation stations located in China with two in
operation, a third under construction and a fourth in the planning stage and slated
for operation in 2019. In addition, CJC, through its subsidiaries, operates two hotels
in China. A more general discussion of CJC's operations is included below.

Pursuant to the Agreement, the Company has agreed to acquire all of the issued and
outstanding shares of CJC from the CJC Shareholders in exchange for the issuance
to the CJC Shareholders of 200,000,000 shares of the Company's common stock,
par value $0.001 per share (the "Common Stock").

In connection with the transactions contemplated under the Agreement, the
Company will cancel 200,000,000 shares of its Common Stock currently
outstanding prior to the closing of the transactions, and therefore the shares of
Common Stock issued to the CJC Shareholders in the transactions pursuant to the
Agreement will represent approximately 58.8% of the issued and outstanding
shares of the Company's Common Stock at the closing of such transactions. As of
October 10, 2016, the Company has 340,000,000 shares of Common stock issued
and outstanding. The acquisition of the shares of CJC and the cancellation of the
shares of Company's Common Stock as described herein, together with the other

6

transactions described in the Agreement, are collectively referred to herein as the "Transactions." Upon completion of the closing of the Transactions, CJC will become a subsidiary of the Company.

Any party may terminate the Agreement if the closing of the Transactions does not occur by February 15, 2017 (unless such failure was due to a breach of the Agreement by such party). The Company's obligation to close is conditioned upon, among other items, (i) certain, limited customary representations and warranties of CJC and the CJC Shareholders remaining true and correct; (ii) CJC and the CJC Shareholders having complied in all material respects with all covenants and conditions required by the Agreement; (iii) no order of any governmental authority being in place which prohibits the Transactions; (iv) receipt of any consents or approvals required for the closing of the Transactions under any contracts, permits, trademarks or intangibles; (v) the completion by the Company, to its satisfaction in its sole discretion, of its due diligence investigation of CJC and its operations; (vi) CJC having provided the Company with certain financial statements and (vii) no material adverse effect having occurred with respect to CJC.

CJC and the CJC Shareholders' obligations to close are conditioned upon, among other items, (i) certain, limited customary representations and warranties of the Company remaining true and correct; (ii) the Company having complied in all material respects with all covenants and conditions required by the Agreement; (iii) no order of any governmental authority being in place which prohibits the Transactions; (iv) no more than 340,000,000 shares of Common Stock being outstanding; (v) the completion by counsel for the CJC Shareholders, to its satisfaction in its sole discretion, of its due diligence investigation of the Company; and (vi) no material adverse effect having occurred with respect to the Company.

*Id.* at 12–13.  Riley signed the Q3 2016 10-Q on behalf of the Company.  *Id.* at 21.

On March 31, 2017, Axiom filed an annual report on Form 10-K with the SEC, stating the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 10-K").  *See* Walsh Decl. Ex. 61.  In the 2016 10-K, Axiom reported a net loss of $1,019,111, *id.* at 43, or $0.00 per diluted share, *id.* at 41, on revenue of $2,234,415, for the fiscal year.  *Id.*  Also in the 2016 10-K, the Company represented to Axiom shareholders that the merger outlined in the Q3 2016 10-Q was completed on December 21, 2016.  *Id.* at 4.  Axiom said that on December 21, 2016, it had acquired "100% of the issued and outstanding shares of CJC and its subsidiaries in exchange for an aggregate of 200,00[0],000 shares of [Axiom's] common stock."  *Id.*  Specifically, the 2016 10-K states:

Acquisition of CJC (Hong Kong), Ltd.

> On December 21, 2016, our wholly owned subsidiary Horizon completed the acquisition of 100% of the issued and outstanding shares of CJC and its subsidiaries in exchange for an aggregate of 200,00[0],000 shares of our common stock following the cancellation of 200,000,000 shares of our common stock. Upon completion of the closing, CJC became a wholly owned subsidiary of our company and the former shareholders of CJC as a group hold approximately 58.8% of our Common Stock. See Item 1.Business–Acquisition of CJC and its subsidiaries.

> Following the completion of the acquisition of CJC, our business and operations are now those of CJC and its subsidiaries as discussed below. Prior to acquisition of CJC, we were a shell company. Following is information on the business and operations of CJC and its subsidiaries that operates within the Power Production Segment and the Hospitality Segment.

*Id.* Riley signed the 2016 10-K on behalf of the Company. *Id.* at 60.

On May 15, 2017, Axiom filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q"). *See* Walsh Decl. Ex. 62. For the quarter, Axiom reported a net loss of $640,243, *id.* at 5, or $0.00 per diluted share, *id.*, on revenue of $446,572, *id.*, compared to a net loss of $263,815, *id.*, or $0.00 per diluted shares, *id.*, on revenue of $319,456 for the same period in the prior year. *Id.* In the Q1 2017 10-Q, the Company reiterated to Axiom shareholders that the merger outlined in the Q3 2016 10-Q was completed on December 21, 2016, when Axiom acquired "100% of the issued and outstanding shares of CJC and its subsidiaries in exchange for an aggregate of 200,00[0],000 shares of [Axiom's] common stock." *Id.* at 14. Specifically, the Q1 2017 10-Q states:

> Acquisition of CJC Holdings, Ltd.

> Pursuant to the terms of a Share Exchange Agreement dated October 10, 2016 and amended on December 21, 2016, the Company, Horizon Resources Co. Ltd., a Cayman Islands company and a wholly owned subsidiary of the Company ("Horizon") acquired all of the issued and outstanding capital stock (the "CJC Shares") of CJC Holdings, Ltd., a Hong Kong corporation (together with its subsidiaries, "CJC") through the exchange of 200,000,000 shares of the Company's

> common stock for the CJC Shares held by the two sole shareholders of CJC, Hu
> Dengyang and Yang Chuan (the "CJC Shareholders"). The acquisition of the CJC
> Shares was completed on December 21, 2016. Pursuant to terms of the Share
> Exchange Agreement and immediately prior to the completion of the acquisition of
> the CJC Shares, Low Tuan Lee, Lim Wei and Chua Seong cancelled an aggregate
> of 200,000,000 shares of our common stock. Upon completion of the closing, CJC
> became a subsidiary of our company and the CJC Shareholders as a group held
> approximately 58.8% of the Company's shares of Common Stock outstanding of
> approximately 340,000,000 shares giving effect to the issuance of the shares to
> acquire the CJC Shares and the share cancellation.

*Id.* Riley signed the Q1 2017 10-Q on behalf of the Company. *Id.* at 23.

According to Defendant Riley's Answer, the SEC issued a subpoena to Axiom, to which a response "was due from Axiom on June 16, 2017," and Axiom was "not supplying the information requested." *Id.*, Ex. 22 ¶ 7.

As of June 19, 2017, by Riley's admission, Hu Dengyang and Yang Chau were still the CJC shareholders, not Axiom or Horizon, even though the Company exchanged the 200,000,000 shares on December 21, 2016 pursuant to the Agreement. Walsh Decl. Ex. 63. Also by Riley's admission, as of June 20, 2017, "the merger was never completed," so that Riley took "steps to rescind the shares that were issued to the CJC shareholders including major shareholders Hu Deng Yang, Yang Chau, Jeffrey Martin, and Rex Cheung." Walsh Decl. Ex. 64. Also on June 20, 2017, the SEC announced a temporary suspension in trading Axiom securities, stating in relevant part that

> The Commission temporarily suspended trading in the securities of Axiom
> Holdings, Inc. because of questions regarding (1) a possible undisclosed controlling
> person since at least August 2015, (2) the accuracy and adequacy of Axiom's
> disclosure of security ownership of certain beneficial owners of its stock in its
> annual report for the fiscal year ended December 31, 2016; (3) the accuracy and
> adequacy of Axiom's disclosures since at least October 2016 in its periodic, annual,
> and current reports, including its December 21, 2016 current report on Form 8-K
> and its annual report for the fiscal year ended December 31, 2016 on Form 10-K,
> concerning the closing or consummation of a share exchange agreement and its
> ownership of related new business operations; and (4) the accuracy of certain
> information conveyed in stock promotion materials since at least April 2016.

9

Walsh Decl., Ex. 65.  Riley "believed it was his duty as an officer and director of Axiom to issue press releases on June 19, 2017" and "on June 20, 2017."  *Id.*, Ex. 22 ¶¶ 5–6.

Throughout the Class Period, Hu Dengyang and Yang Chau were Axiom's controlling shareholders.  Walsh Decl., Ex. 59 at 56; Ex. 22 ¶ 17.  The statements in the purported Agreement disclosed to the public on October 14, 2016, and the statements concerning the Agreement in the Company's Q3 2016 10-Q, 2016 10-K, and Q1 2017 10-Q were false when made because Axiom lacked control over the merger process sufficient to ensure that the Agreement with CJC would be completed, Walsh Decl., Ex. 22 ¶¶ 3–4, and because the Agreement with CJC was never completed,  *id.*, Ex. 22 ¶ 3; Exs. 63–65, despite Axiom's express statements to the contrary during the Class Period.  *Id.*, Exs. 60–62.  This Court has already concluded that during the Class Period, Axiom's securities traded in an efficient market.  *See id.*, Ex. 37 at 2 ("The proposed Judgment Class is entitled to a presumption of the element of reliance as to their claims under Section 10(b) of the Securities Exchange Act of 1934[.]").

As a direct and proximate result of the Company-issued press release dated June 19, 2017, Axiom's share price fell by $0.25 per share, or 21.55%, to close at $0.91 on June 19, 2017.  Walsh Decl., Ex. 66.  On June 20, 2017, also as a direct and proximate result of the Company-issued press release of the same date, Axiom's share price fell another $0.19 per share, or 20.88%, to close at $0.72 on June 20, 2017.  *Id.*  Over those two days, Axiom's share price fell by $0.44 per share, or 37.93% over two trading days, to close at $0.72 on June 20, 2017.  Walsh Decl., Ex. 22 ¶ 7; Ex. 66.

### IV.    ARGUMENT

**A.    The Entry of Default against Axiom, Together with Axiom's Admissions, Establish Its Liability for Violations of Section 10(b) of the Exchange Act**

**1.    The Proffered Exhibits are Admissible as Evidence against Axiom**

Upon the entry of default, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Chen v. Jenna Lane, Inc.*, 30 F. Supp. 2d 622, 623 (S.D.N.Y. 1998) (internal quotation marks and citation omitted). *See also Cotton v. Slone*, 4 F.3d 176, 181 (2d Cir. 1993) (same); *Schruefer v. Winthorpe Grant, Inc.*, 2003 WL 21511157, at *1 n.1 (S.D.N.Y. July 2, 2003) (same, collecting cases). The movant is also "entitled to all reasonable inferences from the evidence offered against the defaulting party." *Moulton*, 779 F.3d at 189.

Nevertheless, the Court previously concluded that "an investigation of the factual basis of the allegations of the complaint" is warranted and ordered Plaintiffs to submit "evidence, in admissible form, of such facts as [they] would have proffered to meet [their] burden of proof on [their] direct case had a trial been held in this action." Walsh Decl., Ex.39 at 1.

As evidence of liability, Plaintiffs respectfully direct the Court to (1) Axiom's SEC filings, appended hereto as Exhibits 61–63 of the Walsh Declaration, (2) Axiom's press releases, appended hereto as Exhibits 64 and 65 to the Walsh Declaration, (3) Riley's Answer, appended hereto as Exhibit 22 to the Walsh Declaration, (4) SEC Release No. 34-80986, appended hereto as Exhibit 66 to the Walsh Declaration, and (5) signed, sealed, and certified copies of Axiom's corporate filings, appended hereto as Exhibit 58 to the Walsh Declaration.

*First*, the Company's statements in its SEC filings are admissible, and are not hearsay, because they are opposing-party statements pursuant to Fed. R. Evid. 801(d)(2). *See, e.g.*, *Chowdhury v. WorldTel Bangl. Holding, Ltd.*, 746 F.3d 42, 54 (2d Cir. 2014). Additionally,

Axiom's Forms 10-Q and 10-K are "public disclosure documents required to be filed with the SEC," so that there is "no serious question as to their authenticity," and thus the Court "may take judicial notice" of the statements in Axiom's SEC filings "as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (quoting Fed. R. Evid. 201(b)(2)).

*Second*, the Company's statements in its SEC Forms 8-K are admissible, and are not hearsay, because they are opposing-party statements pursuant to Fed. R. Evid. 801(d)(2). *See, e.g.*, *Libertad v. Welch*, 53 F.3d 428, 443 n.12 (1st Cir. 1995).

*Third*, Riley's statements in the June 19 and June 20, 2017 press releases are admissible as opposing-party statements pursuant to Fed. R. Evid. 801(d)(2). In the alternative, the press releases are also admissible in their own right pursuant to Fed. R. Evid. 803(6) because they are records of events or conditions set forth in records of regularly conducted activities.

*Fourth*, Riley's admissions in his Answer are admissible as opposing-party statements. "[P]leadings are admissions under Rule 801(d)(2) 'and are admissible in the case in which they were originally filed as well as in any subsequent litigation involving that party.'" *Rosenberg v. Curry Chevrolet Sales & Serv., Inc.*, 152 F.3d 920 (Table), 1998 WL 406307, at *1 (2d Cir. 1998) (unpublished) (quoting *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984)).

*Fifth*, SEC Release No. 34-80986, available to the public at https://www.sec.gov/litigation/suspensions/2017/34-80986.pdf, is properly subject to judicial notice and is thus admissible for its truth. *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 438 n.3 (S.D.N.Y. 2013); *see also In re UBS Auction Rate Sec. Litig.*, 2010 WL 2541166, at *12 n.9 (S.D.N.Y. June 10, 2010).

*Sixth*, Axiom's corporate records filed with the Nevada Secretary of State and bearing her official seal, are public documents and are excepted from the rule against hearsay. *See* Fed. R. Evid. 803(8); 902(2).

Accordingly, the Court should conclude that all of the statements alleged by Plaintiffs and the Class to have been made by Axiom in paragraphs 3, 4, 7, 8, 20–29, 31–32 of the Complaint, and by the SEC in paragraphs 10 and 34 of the Complaint, were in fact made by Axiom and the SEC, respectively.   Additionally, the Court should also conclude that Axiom is a Nevada corporation, as alleged in paragraph 17 in the Complaint.

### 2. The Evidence Establishes Axiom's Liability under Section 10(b) of the Exchange Act

To establish a defendant's liability for violations of Section 10(b) of the Exchange Act, plaintiffs must prove six elements: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 260 n.2 (2d Cir. 2016) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

*First*, Axiom made specific statements in its SEC filings (specifically, in its SEC Form 10-Q Quarterly Report for the third quarter of 2016, SEC Form 10-K Annual Report for the 2016 fiscal year, and SEC Form 10-Q Quarterly Report for the first quarter of 2017) that were materially false and misleading. *Compare* Walsh Decl., Ex. 1 ¶¶ 7–8 & 20–29 *with id.*, Exs. 60–62 (identical). These statements were materially false because they were literally untrue, and the statements were materially misleading because they "failed to disclose material adverse facts about the Company's business, operational and compliance policies." *Id.*, Ex. 1 ¶ 30.

13

> Specifically, [Axiom] made false and/or materially misleading statements and/or failed to disclose that: (i) Axio[m] lacked control over the merger process sufficient to ensure that the Agreement with CJC was [or] would be completed; (ii) accordingly, the Agreement with CJC was never completed; (iii) the Company's issuance of shares to the CJC Shareholders was thus improper; and (iv) as a result of the foregoing, Axiom's public statements were materially false and misleading at all relevant times.

*Id.* Evidence of the statements' falsity comes directly from the Company's own statements in public press releases dated June 19 and 20, 2017, wherein Axiom admitted that the merger never took place and that Axiom's senior management officials knew that the merger never took place. *Compare id.*, Ex. 1 ¶¶ 31–32 *with id.*, Exs. 63–64 (identical). The June 19 and 20, 2017 statements revealed that the Company's unambiguous representations in the Q3 2016 SEC Form 10-Q, 2016 SEC Form 10-K, and Q1 2017 SEC Form 10-Q that the merger had taken place were necessarily untrue. Because Axiom's largest shareholders benefitted from the terms of the merger, but never surrendered their CJC holdings pursuant to the merger agreement, the June 19, 2017 press release further establishes that Axiom knew that its statements were false when they were made. *Id.*, Ex. 63. Accordingly, the Court should conclude that the evidence establishes that Axiom knowingly made materially false and misleading statements during the Class Period.

*Second*, the unopposed and uncontroverted evidence shows that Axiom acted with scienter. Scienter is established when the facts "'giv[e] rise to a strong inference that the defendant acted with' the intent to deceive, manipulate, or defraud." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quoting 15 U.S.C. § 78u–4(b)(2)(A)). "Where a defendant is a corporation," as here, statements made by non-party "corporate actors who are connected to the alleged misrepresentation" often "fall within the locus of a company's scienter." *Id.* (citations omitted). Indeed, "[t]he scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual

speaker." *Id.* at 98–99 (citing *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177–78 (2d Cir. 2015)).

The scienter inquiry considers all "proper sources of facts" and such facts are "'taken collectively.'" *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *16 (S.D.N.Y. Mar. 30, 2018) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007)).  The "core operations" doctrine provides "that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income," looking to, *inter alia*, "the importance of an issue to a corporation."  *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 852 (S.D.N.Y. 2019) (internal quotation marks and citation omitted) (collecting cases).  Where, as here, "plaintiffs have already adequately alleged facts indicating that defendants might have known their statements were false," the "'core operations' doctrine bolsters the strength of the inference of scienter."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011).

Here, the uncontroverted evidence shows that Axiom agreed "to acquire all of the issued and outstanding shares of CJC from the CJC Shareholders in exchange for the issuance to the CJC Shareholders of 200,000,000 shares of the Company's common stock."  Walsh Decl., Ex. 59 at 2. In the 2016 10-K, Axiom stated that it "completed the acquisition of 100% of the issued and outstanding shares of CJC and its subsidiaries in exchange for an aggregate of 200,00[0],000 shares of our common stock.  . . . Upon completion of the acquisition of CJC, our business and operations are now those of CJC and its subsidiaries.  . . . Prior to acquisition of CJC, we were a shell company."  *Id.*, Ex. 61 at 4.

These Company knew that these statements were false when it made them because, according to the June 19, 2017 press release, Axiom's primary shareholders, Hu Deng Yang and

Yang Chau, were "still the shareholders of CJC, instead of Axiom" on December 21, 2016, despite the fact that they already received 200 million Axiom shares pursuant to the purported merger. Walsh Decl., Ex. 63. Furthermore, Defendant Riley admits that he "inform[ed] the SEC regarding dishonest practices of the major shareholders Hu Deng Yang and Yang Chau." *Id.*, Ex. 22 ¶ 8. Riley also admits that he issued the June 19, 2017 press release after he "learned of several deceptive events perpetrated by major shareholders Hu Deng Yang [and] Yang Chau." *Id.* ¶ 5. Accordingly, the Court should conclude that Plaintiffs have established that the Company acted with scienter.

*Third*, the Court has already determined that the "Class is entitled to a presumption of the element of reliance as to their claim under Section 10(b) of the Securities Exchange Act of 1934 pursuant to the standard set forth in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)." Walsh Decl., Ex. 37 at 2. Accordingly, the Court has already determined that Plaintiffs and the Class relied upon Axiom's securities trading on an active and efficient market during the Class Period. Neither Axiom nor Riley has challenged this ruling, so this Court should stand by its prior decision.

*Fourth*, on June 20, 2017, Axiom's share price fell by $0.44, or 37.93%, per share over two trading days, to close at $0.72 per share on June 20, 2017. Walsh Decl., Ex. 66. The Class Representatives suffered economic losses when Axiom's price fell by $0.44 to close at $0.72 per share on June 20, 2017. Walsh Decl., Exs. 32–35.

*Fifth*, Plaintiffs have established loss causation. "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 260 (2d Cir. 2016) (quotations and citations omitted). Where "the relationship between the plaintiff's investment loss and the information misstated or concealed by

16

the defendant is sufficiently direct, loss causation is established." *Id.* Here, on June 20, 2017, the SEC suspended trading in Axiom's securities, citing concerns with "a possible undisclosed controlling person," "the accuracy and adequacy of Axiom's disclosure of security ownership of certain beneficial owners [in the 2016 SEC Form 10-K]," and "the accuracy and adequacy of Axiom's disclosures since at least October 2016 in its periodic, annual, and current reports." *Id.*, Ex. 65. The SEC's suspension order—which cites to the same materially false and misleading statements as Plaintiffs here—is strong evidence of loss causation. Accordingly, the Court should conclude that Plaintiffs have the element of loss causation.

For all of the foregoing reasons, the Court should conclude that (1) Plaintiffs and the Class have established, with admissible evidence, that Axiom violated SEC Rule 10b–5, 17 C.F.R. § 240.10b–5; (2) as a direct and proximate result of Axiom's violations, the Plaintiffs and the Class suffered financial harm; and (3) Axiom is therefore liable to the Plaintiffs and the Class for monetary damages pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and Section 21D of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(e).

**B.** **The Court Should Enter a Default Judgment for the Plaintiffs and the Class and against Axiom**

Courts generally consider eight (8) factors in deciding a motion for default judgment pursuant to Rule 55, including (1) whether the movant has been "substantially prejudiced by the delay involved," (2) "whether the grounds for default are clearly established," (3) "whether the default was willful," (4) whether the movant "would be prejudiced by the denial of the motion for default judgment," (5) "whether there are any meritorious defenses to plaintiff's claims," (6) "whether any material issues of fact remain," (7) "the amount of money at issue," and (8) "how harsh an effect a default judgment might have on the defendant." *Lemus v. Manhattan Car Wash,*

*Inc.*, 2010 WL 4968182, at *7 (S.D.N.Y. Nov. 24, 2010) (internal quotation marks and citations omitted) (collecting cases).

### 1.   Plaintiffs and the Class are Substantially Prejudiced by Axiom's Delay

Defendant Axiom was served with the Summons and Complaint on October 4, 2018. Walsh Decl., Ex. 17.  Axiom has been served with all pertinent papers in this action, *see id.*, Exs. 2, 4, 9–20, 23, 28, 36, 43, 56, and yet has failed ever to appear in this case.  *Id.*, Ex. 57.   Over the past two years, Plaintiffs and the Class have received no redress for the losses they incurred when Axiom's share price fell upon the revelation of Axiom's fraud.  Absent default judgment, "there are no additional steps available to secure relief in this Court," *House of Diamonds, Inc. v. Borgioni LLC*, 2009 WL 2633144, at *6 (S.D.N.Y. Aug. 26, 2009), so that "denying the motion would be unfairly prejudicial" to the Plaintiffs and the Class because Axiom "has failed to respond or appear."  *HICA Educ. Loan Corp. v. Bolte*, 2012 WL 423361, at *2 (S.D.N.Y. Feb. 10, 2012). Accordingly, the Court should conclude that Plaintiffs and the Class are, and have been, substantially prejudiced by Axiom's delay and failure to appear.

### 2.   The Grounds for Default Judgment are Clearly Established

The grounds for default are clearly established because Axiom has been properly served, has failed to respond, and the Clerk of the Court has entered default as to Axiom pursuant to Fed. R. Civ. P. 55(a).  Plaintiffs and the Class now seek a default judgment from the Court pursuant to Fed. R. Civ. P. 55(b).

### 3.   Axiom's Default is Willful

Axiom was properly served with notice of the action and yet has failed to appear to answer the Complaint.  Moreover, Plaintiffs have served all of their motion papers, and all the Court's resulting orders, upon Axiom through its registered agent.  Yet, Axiom has failed to appear to

answer the Complaint.  Plainly, Axiom's "non-appearance in the action and failure to respond to the Complaint and the instant motion practice indicates willful conduct."  *Bolte*, 2012 WL 423361, at *2 (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)).  Accordingly, the Court should conclude that Axiom's default is willful.

### 4.        Axiom Has No Meritorious Defenses to Plaintiffs' Claims

Plaintiffs and the Class have filed herewith admissible, uncontroverted evidence that establishes Axiom's liability.  *See* Walsh Decl., Exs. 57–67.  Furthermore, Axiom is precluded from raising any defenses to the claims asserted in the Complaint because the Company's failure to appear or respond notwithstanding proper service constitutes an admission of all the well-pleaded allegations in the Complaint.  *Moulton Masonry*, 779 F.3d at 189.  *See also HICA*, 2012 WL 423361, at *2 ("[T]he Court is unable to determine whether Defendant has a meritorious defense to Plaintiff's allegations because he has presented no such defense to the Court.").

Plaintiffs and the Class have established *prima facie* that Axiom (1) violated Section 10(b) of the Exchange Act, (2) harmed Plaintiffs and the Class as a result of such violations, (3) is liable to Plaintiffs and the Class for such harm, and (4) has failed to come forth with any countervailing, admissible evidence supporting any purported defense.  Alternatively, and additionally, applying *Moulton Masonry*, Axiom's years-long failure to appear in the case or respond to the Complaint constitutes an admission of the allegations in the Complaint.  Accordingly, the Court should conclude that Axiom has no meritorious defenses to the Complaint.

### 5.        The Other Factors Do Not Support Denial of Relief

The remaining equitable factors do not weigh in favor of denying Plaintiffs' motion for default judgment.  For example, although the Court may consider "whether any material issues of fact remain," *Lemus*, 2010 WL 4968182, at *7, Axiom's failure to respond to any of the documents with which it has been served, and its failure to come forth with any countervailing evidence,

constitutes an admission of all of the allegations in the Complaint.  *Moulton Masonry*, 779 F.3d at

189.  Similarly, while the Court may consider "the amount of money at issue," and "how harsh an

effect a default judgment might have on the defendant," *Lemus*, 2010 WL 4968182, at *7, Axiom's

default is neither technical nor the product of excusable neglect.  *See, e.g.*, *Trs. of Local 7 Title*

*Indus Welfare Fund v. Caesar Max Tile Corp.*, 2014 WL 991723, at *6 (E.D.N.Y. Mar. 13, 2014).

Instead, Axiom's "default is crystal clear."  *Hirsch v. Innovation Int'l, Inc.*, 1992 WL 316143, at

*2 (S.D.N.Y. Oct. 19, 1992).

 Axiom has had notice of this lawsuit for nearly two years and has not responded.  It has

flouted authority of this Court without explanation, and has kept Plaintiffs in a state of financial

limbo.  It is difficult to imagine that there could be any circumstances under which the effect of a

default judgment on Axiom would outweigh the harms Axiom's conduct and delay have caused

to Plaintiffs.  Accordingly, the Court should conclude that the other factors do not justify denying

Plaintiffs' motion for default judgment.

 **C.** **The Court May Appropriately Enter Default Judgment on the Issue of**
  **Damages as to Axiom before Disposing of the Claims as to Riley**

 The Complaint alleges, and the evidence submitted herewith establishes, that Axiom is

principally liable to Plaintiffs and the Class for the Company's violations of the Exchange Act.

Specifically, Count One is brought against Axiom pursuant to 17 C.F.R. § 240.10b–5 for

violations of Section 10(b) of the Exchange Act.  *See* Walsh Decl., Ex. 1 ¶¶ 45–54.  By contrast,

Count Two is brought against Riley in his capacity as a controlling person of Axiom "pursuant to

Section 20(a) of the Exchange Act for the violations" of Section 10(b) "committed by Axiom."

*Id.* ¶ 59.  Axiom and Riley are thus jointly and severally liable to Plaintiffs and the Class, but

recovery from Riley "cannot exceed the damages assessed" against Axiom, because Axiom is the

"primary violator[]."  *Boguslavsky v. Kaplan*, 159 F.3d 715, 721 (2d Cir. 1998).  *See also In re*

*SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 497 (S.D.N.Y. 2018) (same).  Thus, only if Axiom is deemed liable for violations of Section 10(b) can Riley be liable for his own violations of Section 20(a).  In any event, Riley's liability for damages are co-extensive with, and cannot exceed, the amount of damages Plaintiffs may recover from Axiom for its violations of Section 10(b).

Furthermore, default judgment is proper against any "party who 'has failed to plead or otherwise defend.'"  *Sec. & Exch. Comm'n v. Tavella*, 77 F. Supp. 3d 353, 357 (S.D.N.Y. 2015) (quoting Fed. R. Civ. P. 55(a)).  Although Riley has answered the Complaint, he can speak only for his own "'control of [Axiom] as well as [his] particular culpability.'"  *SunEdison*, 300 F. Supp. 3d at 497 (quoting *Boguslavsky*, 159 F.3d at 720)).  In view of its role as the primary violator, its failure to appear, subsequent default, and Plaintiffs' uncontroverted evidence establishing Axiom's liability, the Company is liable for all of the damages sought by Plaintiffs and the Class.  Accordingly, the Court should conclude that entry of default judgment on the issue of damages against Axiom is proper notwithstanding the remaining claim against Riley, because Axiom is primarily liable.

### D.    An Inquest into Damages is Unnecessary

To enter a default judgment on the issue of damages, "the court *may* conduct hearings or make referrals" when necessary to "determine the amount of damages."  Fed. R. Civ. P. 55(b)(2) (emphasis added).  This Rule "allows but does not require the district judge to conduct a hearing."  *Moulton Masonry*, 773 F.3d at 189 (internal quotation marks and citation omitted).  Where, as here, damages are prescribed by statute, an inquest into damages is even less necessary because the amount claimed is "liquidated or capable of ascertainment from definite figures."  *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323–24 (7th Cir. 1983).  *See also Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974) (on a motion for default judgment, "the quantum of damages remains to be established by proof *unless the amount is liquidated or*

21

*susceptible of mathematical computation*.") (emphasis added); *Kleartex (U.S.A.), Inc. v. Kleartex SDN BHD*, 1994 WL 733688, at *3 (S.D.N.Y. June 9, 1994) (same).

Although securities fraud cases are doubtless complex, "the determination of damages upon default does not require mathematical precision," especially because "[a]bsolute certainty is not possible in complex determinations such as quantifying the influence of market factors on a stock's price" for purposes of a class action judgment, even after a trial.  *In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154, 1171 (E.D.N.Y. 1996).

Indeed, the sum of the recovery to which Plaintiffs' and Class Members' are entitled is well-established by the text of the Exchange Act, by the text of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and by longstanding case law.  First, Section 28(a) of the Exchange Act provides that each Plaintiff and each Class Member is entitled to recover from Axiom his, her, or its actual, out-of-pocket damages.  *See* 15 U.S.C. § 78bb(a) (a prevailing Exchange Act plaintiff is entitled to "the actual damages to that person on account of the act complained of.").  Second, Section 21D of the PSLRA provides that, in a private action wherein a plaintiff seeks to prove damages vis-à-vis the market price of a security:

> [T]he award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38–39 (2d Cir. 2012) (quoting 15 U.S.C. § 78u–4(e)(1)).  "Plaintiffs who sell their securities prior to the close of the 90-day period are subject to a damage cap of the difference between purchase price and the average trading price between the date of disclosure and the sale date."  *Id.* at 39 n.2 (citing 15 U.S.C. § 78u–4(e)(2)).  The "mean trading price," in turn, is the average of the daily closing prices for the security for "'each day during the 90-day period.'"  *Id.* at 39 (quoting 15 U.S.C. § 78u–4(e)(3)).

To this end, courts in this District have routinely accepted aggregated damages models prepared by experts to estimate class-wide damages under Section 10(b). *See, e.g.*, *In re Puda Coal Sec. Inc. et al. Sec. Litig.*, 2017 WL 65325, at *15 (S.D.N.Y. Jan. 6, 2017) (collecting cases), *report and recommendation adopted*, 2017 WL 511834 (S.D.N.Y. Feb. 8, 2017). Accordingly, the damages to which Plaintiffs and the Class are entitled are mathematically ascertainable, rendering an inquest into damages unnecessary.

### E.     The Class is Entitled to an Award of $1,420,000 in Damages, and to Recover Interest, Reasonable Attorneys' Fees & Costs

#### 1.     Statutory Damages

Plaintiffs and the Class are entitled to an award of $1,420,000 in statutory compensatory damages. Plaintiffs and the Class rely upon the attached report prepared by Fideres Partners LLP Report in support of their aggregated damages calculation. *See* Walsh Decl., Ex. 67 (the "Fideres Report"). In deciding motions for default judgment where a defendant fails to appear, "courts have awarded damages by relying solely on the papers provided by the plaintiff." *Francis v. City of New York*, 2019 WL 8918743, at *3 (S.D.N.Y. Nov. 12, 2019) (citing *Moulton Masonry*, 779 F.3d at 189), *report and recommendation adopted*, 2020 WL 2792995 (S.D.N.Y. May 29, 2020). *See also Sette-Hughes v. Sprauve*, 663 F. App'x 10, 11 (2d Cir. 2016) (unpublished) (upholding district court's use of plaintiff's uncontroverted property appraisal to determine damages on default judgment). The court should follow suit and do so here.

Fideres is a leading provider of economics expertise in securities fraud litigation across the United States. *See* Walsh Decl., Ex. 68. Its specialized securities fraud economists are Professors James Spindler, Alan D. Jagolinzer, and Lauren Cohen. *See id.* The Fideres Report sets forth aggregate class-wide damages attributable to Axiom only. Consistent with *Dura Pharm. v. Broudo*, 544 U.S. 336 (2005), the Fideres Report is based directly upon the per share damage

estimates throughout the Class Period by determining that the artificial inflation was consistent. Walsh Decl., Ex. 67. The Fideres Report concludes that aggregate class-wide damages to investors who purchased Axiom common stock, estimated conservatively using the PSLRA look-back price of $0.53, amount to $1,420,000. *See id.*

The Fideres Report applies the measure of damages generally applied in Section 10(b) cases: the reduction in dollar inflation over an investor's holding period. *Id.* Fideres aggregated damages using the two-trader proportional model. *Id.* Accordingly, the Court should accept the damages analysis set forth in the Fideres Report, given the expertise of its authors and the universal acceptance of the methodologies that it employs to calculate the Class's aggregate damages.

### 2. Interest

The Court should also order Axiom to pay both pre- and post-judgment interest. The award of interest "'is ordinarily left to the discretion of the district court.'" *In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 161–62 (S.D.N.Y. 2012) (quoting *Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir. 1998)). Courts consider "'(i) the need to fully compensate the wronged party for the actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and (iv) such other general principles as are deemed relevant by the court.'" *Id.* at 162 (quoting *Sec. & Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1376 (2d Cir. 1996)). Where a defendant has "engaged in fraud or other conscious wrongdoing," as in the "prototypical" securities fraud action, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 585 (S.D.N.Y. 2015), "the remedial purpose of the statute takes on special importance." *First Jersey*, 101 F.3d at 1476.

An award of interest is necessary here as full recompense for Plaintiffs' harms, which have been exacerbated by Axiom's willful failure to respond to this action for nearly two years. Additionally, given that the evidence submitted herewith establishes that Axiom acted with

scienter when it defrauded Plaintiffs, assessing interest would serve the remedial aims of the statute.  Accordingly, the Court should order Axiom to pay pre-judgment interest in an amount whose sum that is based on the yield of a One-Year Treasury Note compounded annually starting June 16, 2017.  *See Vivendi*, 284 F.R.D. at 163 (finding such a calculation appropriate in analogous circumstances).  Additionally, the Court should also order Axiom to pay post-judgment interest at a rate of 1.34% per annum, as set forth in 28 U.S.C. § 1961.  *See Nomura*, 104 F. Supp. 3d at 585.

## F.    Class Counsel Reserve Their Right To Move For Attorney's Fees and Costs

Class Counsel respectfully informs the Court that it intends to file a motion for attorney's fees and expenses alongside any future request to distribute recovered funds from the Total Damages Figure "at a time the court sets."  Fed. R. Civ. P. 23(h)(1).  Moving for attorney's fees and expenses prior to such recovery on behalf of the Plaintiffs and the Class would be premature, as Class Counsel cannot readily ascertain what the appropriate amount of fees and expenses will be.  Nevertheless, Class Counsel hereby reserve their right to move for such reasonable attorney's fees and costs from any recovery they obtain from the Class.  *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132–33 (2d Cir. 2008).

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request an order (a) entering a default judgment for the Class against Defendant Axiom as to Count I of the Complaint; (b) holding Axiom liable to the Class for statutory damages in the amount of $1,420,000; (c) holding Axiom liable to Class Counsel for their reasonable attorneys' fees and costs in an amount to be later-determined by the Court upon future motion; and (d) for such other and further relief as this Court may deem just and proper.

Dated:  January 21, 2021

Respectfully submitted,

POMERANTZ LLP

/s/ Murielle J. Steven Walsh
Jeremy A. Lieberman
Murielle Jacqueline Steven Walsh
600 Third Avenue
New York, New York 10016
Telephone:  (212) 661.1100
E-mail:  jalieberman@pomlaw.com
         mjsteven@pomlaw.com

*Attorneys for the Class & for Additional
Plaintiff Ashley Desvarieux*